**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF INDIANA**
**FORT WAYNE DIVISION**

| | | |
|---|---|---|
| TERRY R. COOPER | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CAUSE NO.: 1:04-CV-385-TS |
| | ) | |
| VERIFICATIONS, INC. and DELTA | ) | |
| AIRELITE BUSINESS JETS, INC. | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

Before the Court is a Motion for Summary Judgment [DE 58], filed by Defendant

Verifications, Inc., on March 20, 2007.  This case, arising from events in 2001 and 2002,

involves claims under the Fair Credit Reporting Act and various state law causes of action

against both Defendant Verifications and Defendant Delta AirElite Business Jets, Inc.

**BACKGROUND**

On October 15, 2004, the Plaintiff, Terry R. Cooper, filed a complaint against Delta

AirElite Business Jets, Inc. (Delta), and Verifications, Inc. (Verifications/the Defendant). The

Complaint alleges violations of the Fair Credit Reporting Act and includes state law claims:

defamation, invasion of privacy, negligence and/or recklessness, and interference with

employment/contractual relations. The Complaint seeks compensatory and punitive damages,

injunctive and declaratory relief, and attorneys' fees and costs.

On March 14, 2005, the Plaintiff filed an Amended Complaint against the two

Defendants. The Amended Complaint adds one paragraph, which alleges Verification's reporting

about his background resulted in his termination from Delta in September 2004. Both

Defendants filed answers to the Amended Complaint.

On September 27, 2005, Delta filed a notice of bankruptcy filing, which automatically stayed proceedings in the case. On September 26, 2006, the Plaintiff filed a motion to expedite against Defendant Verifications, asking the Court to let the case continue against Verifications. On October 6, 2006, the Plaintiff, Defendant Verifications, and Delta filed a joint stipulation seeking to lift the stay in proceedings for only Verifications. On October 25, 2006, the Court ordered the stay lifted for Verifications.

On March 20, 2007, Defendant Verifications filed a motion for summary judgment. On May 21, 2007, the Plaintiff filed a response in opposition to the motion for summary judgment. On June 4, 2007, the Defendant filed its reply.

## LEGAL STANDARD

The Federal Rules of Civil Procedure mandate that motions for summary judgment be granted "if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(c).

A court's role is not to evaluate the weight of the evidence, to judge the credibility of witnesses, or to determine the truth of the matter, but instead to determine whether there is a genuine issue of triable fact. *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 249–50 (1986); *Doe v. R.R. Donnelley & Sons Co.*, 42 F.3d 439, 443 (7th Cir. 1994). To determine whether any genuine issue of fact exists, the court must pierce the pleadings and assess the proof as presented in depositions, answers to interrogatories, admissions, and affidavits that are part of the record.

Fed R. Civ. P. 56(c), Advisory Committee Notes, 1963 Amendments. The party seeking summary judgment bears the initial burden of proving there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). In response, the nonmoving party cannot rest on bare pleadings alone but must use the evidentiary tools listed above to designate specific material facts showing that there is a genuine issue for trial. *Id.* at 324; *Insolia v. Philip Morris Inc.*, 216 F.3d 596, 598 (7th Cir. 2000). The evidence the nonmovant relies on must be identified with reasonable particularity and must be "competent evidence of a type otherwise admissible at trial." *Bombard v. Fort Wayne Newspapers, Inc.*, 92 F.3d 560, 562 (7th Cir. 1996); *see also Powers v. Dole*, 782 F.2d 689, 696 (7th Cir. 1986) (stating that when evidence is offered through exhibits on a summary judgment motion, those exhibits "must be identified by affidavit or otherwise admissible").

A material fact must be outcome determinative under the governing law. *Insolia*, 216 F.3d at 598–99. Although a bare contention that an issue of fact exists is not sufficient to create a factual dispute, the court must construe all facts in a light most favorable to the nonmoving party as well as view all reasonable inferences in that party's favor. *See Bellaver v. Quanex Corp.*, 200 F.3d 485, 492 (7th Cir. 2000). A court must consider the evidence as a jury might, "construing the record in the light most favorable to the nonmovant and avoiding the temptation to decide which party's version of the facts is more likely true." *Shepherd v. Slater Steels Corp.*, 168 F.3d 998, 1009 (7th Cir. 1999); *see also Payne v. Pauley*, 337 F.3d 767, 770 (7th Cir. 2003) (noting often stated proposition that "summary judgment cannot be used to resolve swearing contests between litigants"). The court may not grant summary judgment "if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248.

3

Pursuant to local rule, the Court is to assume that the facts claimed by the moving party and supported by admissible evidence are admitted to exist without controversy, except to the extent such facts are controverted in a "Statement of Genuine Issues" filed in opposition to the motion and supported by admissible evidence. N.D. Ind. L.R. 56.1(b).

## MATERIAL FACTS

Construing all facts in a light most favorable to the Plaintiff, and drawing all legitimate inferences in favor of the Plaintiff, the following facts are assumed true for the purposes of summary judgment.

The Plaintiff, Terry R. Cooper, was employed in 2002 by Speedbird Aviation as a pilot. Speedbird operated jets on a contract basis for Delta. On October 24, 2002, Delta asked Defendant Verifications, an employment screening company, to conduct a criminal background check of the Plaintiff.

Significantly, Delta provided the Plaintiff's FBI record to the Defendant and asked for more details about the information in that record, specifically some incidents in Texas. (Plaintiff's Resp. to Mot. for Summ. J., Ex. D, Poquette letter, at 1; DE 64-5 at 1). The FBI document is from the FBI's Criminal Justice Information Services Division, located in Clarksburg, West Virginia. The details of the FBI record are highly relevant to this case. Defendant Verifications does not deny or contest that it received the FBI record from Delta, nor does it challenge the authenticity of the April 23, 2003, letter from Mary Poquette, chief compliance officer at Verifications, to the Plaintiff's attorney. This letter outlines the chronology of the background investigation, dispute, and amended report to Delta.

4

The FBI document, which uses all capital letters, has two entries. The first lists an arrest from July 17, 2000, on a charge of violating 21 U.S.C. § 952, importation of controlled substances. In the same first entry under the "COURT" heading, it indicates the Plaintiff was charged with a different violation, 21 U.S.C. § 844. The document then lists the offense as "POSSESSION OF ANABOLIC STEROIDS." (Def. Discl., Doc. 4, 3, FBI Record at 1; DE 35-4 at 5.) Under "SENTENCE," the document states: "SENTENCED ON 10-02-2000 TO 1 YEAR PROBATION *PURSUANT TO 18 U.S.C. § 3607 (WITHOUT ENTERING A JUDGMENT OF CONVICTION)* AND FINED $1000." (*Id.*) (emphasis added). After that, another "CHARGE" heading lists "IMPORTATION OF CONTROLLED SUBSTANCES." (*Id.*) Then, under a second "SENTENCE" heading, the document states: "CHARGES DISMI 10/02/2000." (*Id.*)

The second entry is also from July 17, 2000, and lists a violation of 21 U.S.C. § 952, "IMPORTATION OF CONTROLLED SUBSTANCES STEROIDS" under both the "CHARGE" heading and the "COURT" heading. Under the "SENTENCE" heading, it states "SUP PROB 10-12-00 FOR 1 YR." (*Id.*)

Using this FBI record, Defendant Verifications on October 30, 2002, found a federal criminal case involving the Plaintiff in the records of the Western District of Texas via the Public Access to Court Electronic Records (PACER) system. PACER is a publicly-accessible online service that allows court staff and attorneys to file and obtain case documents electronically.

The Defendant states, and the Plaintiff does not contest, that the PACER docket included two entries, reproduced here exactly as they were found:

> 10/2/00 – Plea of guilty entered by Terry Ray Cooper (1) count(s) 2 (dg) [Entry date 10/11/00]
> 10/2/00 – Guilty plea accepted by the court as to Terry Ray Cooper (1) count(s) 2 ; Mooted Motions: (dg) [Entry date 10/11/00]

(Mot. for Summ. J., Ex. A1, Aff. of Mary Poquette at 3; DE 58-2 at 6.) This docket is as it appeared on October 30, 2002, according to the affidavit by Poquette, chief compliance officer of the Defendant.

> The docket also contains two other relevant entries, reproduced exactly as they are found:
> 10/2/00 --   Sentencing , Terry Ray Cooper (1) count(s) 2   held Terry Ray Cooper  (1) count(s) 2    1 years probation, $1000 fine, $25.00 S/A ; Mooted Motions: (dg) [Entry Date 10/11/00]
> . . . .
> 10/2/00 --   Dismissed count on motion by the Govt   Terry Ray Cooper (1) count(s) 1 (dg) [Entry date 10/11/01]

(*Id.* at 4; DE 58-2 at 7).

The top of the docket also contains relevant information. Under "Pending Counts," it lists 21 U.S.C. § 844, possession of controlled substances. Under the "Disposition" heading for that count, it states: "1 years [sic] probation, $1000 fine, $25.00 S/A" (*Id.* at 1; DE 58-2 at 4). Under the heading "Terminated Counts," the docket lists 21 U.S.C. § 952, importation of controlled substances. Under the "Disposition" heading for this charge, the docket states: "Dismissed on Government Motion." (*Id.*)

When the Defendant found this information on October 30, 2002, it did not obtain the actual court judgment for the case. The judgment, which has its own docket entry stamped as filed on October 25, 2000, states the following:

> On motion of the United States, the Court has dismissed the remaining counts as to this defendant.

> The defendant pled guilty to Count(s) Two (2) of the Indictment on October 2, 2000. Accordingly, the defendant is adjudged guilty of such Count(s), involving the following offense(s):

| Title & Section | Nature of Offense | Date of Offense | Count Number(s) |
|---|---|---|---|
| 21 U.S.C. § 844(a) | Possession of Anabolic Steroids | July 17, 2000 | Two |

> As pronounced on October 2, 2000, the defendant is sentenced as provided in

6

pages 2 through 5 of this Judgment. *The sentence is imposed pursuant to the Sentencing Reform Act of 1984, 18 U.S.C. § 3607 (without entering a judgment of conviction).*

(Def. Discl., Doc. 4, Judgment at 1; DE 35-4 at 1) (emphasis added). The judgment order was signed on October 20, 2000, by Judge Eldon E. Fallon of the United States District Court for the Western District of Texas.

After discovering the information on the docket, but not obtaining the actual judgment, the Defendant, still on October 30, 2002, contacted the U.S. Attorney's Office for the Western District of Texas "and confirmed the name and date of birth on the record." (Plaintiff's Resp. to Mot. for Summ. J., Ex. D at 1; DE 64-5 at 2). "We then provided the information regarding [that case] in our report to our client showing one charge being 'Dismissed' and the other as 'Guilty.'" (Plaintiff's Resp. to Mot. for Summ. J., Ex. D, Poquette letter, at 1; DE 64-5 at 2). Specifically, the Defendant's report to Delta listed a charge of "Controlled substance - possession (Felony)," as resulting in a disposition of "Guilty," and another charge of "Controlled substances - Import (Felony)," as "Dismissed." (Def. Discl., Doc. 3, Verifications Chronology at 1; DE 35-3 at 1.)

On December 18, 2002, the Plaintiff contacted Defendant Verifications to challenge the report on his background. The Defendant checked with a clerk in the Western District of Texas and was informed that one charge against the Plaintiff "carried a 'guilty' disposition." (Plaintiff's Resp. to Mot. for Summ. J., Ex. D, Poquette letter, at 1; DE 64-5 at 2). The Defendant then informed the Plaintiff of that information. Later that day, the "Court Clerk from [the] US District office" called the Defendant and stated the "guilty" notation was not correct and that it should state "withheld judgment." "The Court Clerk stated this was an error on their [sic] part and that the information would be corrected in PACER within the next 48 hours." (Plaintiff's Resp. to Mot. for Summ. J., Ex. D, Poquette letter, at 2; DE 64-5 at 3.) The Defendant then informed

7

Delta by phone of this news and sent a revised report. On December 19, 2002, the Defendant

sent an updated written report to Delta and to the Plaintiff. The updated report to Delta changed

the disposition for the first charge, "Controlled substance - possession (Felony)" to "Withheld

judgment" instead of "Guilty"; the "Dismissed" notation for other charge of "Controlled

substances - Import (Felony)" remained as it was in the first report. (Def. Discl., Doc. 5,

Background Investigation Report at 3; DE 35-5 at 3.)

On or about December 20, 2002, the Plaintiff's security clearance was suspended and he

was not allowed to pilot any flights. His flight status was reinstated on February 3, 2003. The

Plaintiff was terminated from his position with Speedbird/Delta in September 2004.


**ANALYSIS**

**A.      Fair Credit Reporting Act**

The Defendant does not contest that it is a credit reporting agency for purposes of

summary judgment (Memo. of Law in Support of Def. Mot. for Summ. J. at 5, n.1; DE 59 at 5,

n.1), and the Court would agree that the Defendant is a credit reporting agency under the Fair

Credit Reporting Act (FCRA). A credit reporting agency is "any person which, for monetary fees

. . . regularly engages . . . in the practice of assembling or evaluating consumer credit

information or other information on consumers for the purposes of furnishing consumer reports

to third parties" and does so through interstate commerce. 15 U.S.C. § 1681a(f). The term

"person" in the statute includes a corporation. *Id.* § 1681a(b). The reports compiled by the

Defendant and sent to Delta in this case are "consumer reports" within the meaning of the

statute. *Id.* § 1681a(d)(1) ("any written . . . communication of any information by a consumer

reporting agency bearing on a consumer's . . . character, general reputation, [or] personal characteristics . . . which is used or expected to be used . . . for the purpose of serving as a factor in establishing the consumer's eligibility for . . . employment purposes").

A person or credit reporting agency who negligently violates a requirement of the FCRA "with respect to any consumer" is liable to that consumer for resulting damages, legal costs, and attorney's fees. *Id.* § 1681o. The statute provides for punitive damages for willful noncompliance with FCRA requirements. *Id.* § 1681n.

Unfortunately, the Plaintiff's complaint does not list the particular subsections of the FCRA that the Defendant allegedly violated. However, based on the allegations in the complaint, the Court has determined that the Plaintiff alleges violations of § 1681e(b) and § 1681k. Accordingly, the Court must determine if there is a genuine issue of material fact about whether the Defendant violated § 1681e(b) or § 1681k.

1.      *§ 1681e(b): Reasonable Procedures To Assure Maximum Possible Accuracy of Information*

The FCRA requires that "[w]henever a consumer reporting agency prepares a consumer report it shall follow reasonable procedures to assure maximum possible accuracy of the information concerning the individual about whom the report relates." *Id.* § 1681e(b). The Plaintiff alleges that the Defendant did not comply with this requirement because it failed to fully investigate the Plaintiff's background and learn all the relevant information, and because it provided false information about Plaintiff to Delta. "Plaintiff alleges that Verifications, Inc. acted maliciously and with willful intent to injure the Plaintiff by submitting false information to

Delta AirElite." (Pl. First Am. Compl. at 2, ¶10; DE 378 at 2.)

A claim under § 1681e(b) requires a sufficient allegation that the information conveyed in the consumer report was "inaccurate." *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971 (7th Cir. 2004); *see also Henson v. CSC Credit Servs.*, 29 F.3d 280, 284 (7th Cir. 1994). However, the FCRA is not a strict liability statute. A credit reporting agency can report inaccurate information and yet still escape liability "if it followed 'reasonable procedures to assure maximum possible accuracy.'" *Sarver*, 390 F.3d at 971 (quoting 15 U.S.C. § 1681e(b)).

The Seventh Circuit's ruling in *Henson* is instructive for both issues, inaccuracy and reasonable procedures. In that case, a court clerk erroneously listed on the judgment docket a deficiency judgment against the plaintiff when it really should have only been entered against the plaintiff's brother. 29 F.3d at 283. The defendants, two credit reporting agencies, argued they accurately reported the information in the public records, and that it was true that "a judgment had been entered against" the plaintiff, even if the judgment was entered wrongly by court personnel. *Id.* at 285. The plaintiff argued that the credit report was inaccurate because, in reality, there was no money judgment against him. *Id.* The court agreed with the plaintiff, relying on the court documents and noting that reliance on the erroneous docket entry was not correct. *Id.*

*(a) Inaccuracy*

In this case, regardless of what the docket states or how it can be reasonably interpreted, the actual signed judgment order of the judge in the case is the operative document. *See Henson*, 29 F.3d at 285 ("Thus, we must look to the 'Record of Judgment and Orders,' to determine

whether judgment was entered against [the plaintiff]".). This document states that one charge was dismissed, that the plaintiff pleaded guilty to a second charge (so far so good for the Defendant's report to Delta), and that the sentence for the second charge was imposed without entering a judgment of conviction. The Defendant's report was inaccurate by omitting that last point. That last bit of information, not included in the Defendant's report, changes the import and meaning of the guilty plea notation. A guilty plea notation alone would mean that the Plaintiff has a criminal conviction. But the phrase "without entering a judgment of conviction," at the very least, would raise some doubt about whether the Plaintiff has a criminal conviction. In other words, "without . . . conviction" is like saying "no conviction."

In *Henson*, the Seventh Circuit noted that even though "[t]he documents do conclusively establish, however, that the clerk erroneously *noted* in the Judgment Docket that a money judgment has been entered against [the plaintiff]," 29 F.3d at 285, the report was inaccurate nonetheless because the court documents themselves showed no judgment was "entered" or "rendered" against the plaintiff. *Id.* Likewise, the court documents here, in particular the actual judgment order signed by the judge, establish that one charge was dismissed, while for the other charge, the sentence was imposed without entering a judgment of conviction. That makes the Defendant's report inaccurate.[1]

### (b) Reasonableness of Procedures and Notice

The issue of the reasonableness of the Defendant's procedures is more complicated. At

---

[1] Because the Plaintiff did in fact plead guilty, which is different from being adjudged guilty, the Defendant's report could also qualify as an "ensemble [that] was potentially misleading," *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001), which can trigger "the statutory duty to reconsider an individual's credit report if alerted to a potential error." *Id.*

the outset, it is important to note that:

> [t]he determination of the "reasonableness" of the defendant's procedures, like other questions concerning the application of a legal standard to given facts (notably negligence, a failure to exercise reasonable care), is treated as a factual question even when the underlying facts are undisputed. It therefore cannot be resolved on summary judgment unless the reasonableness or unreasonableness of the procedures is beyond question[.]

*Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001), *cited in Westra v. Credit Control of Pinellas*, 409 F.3d 825, 827 (7th Cir. 2005).

As noted above, the Seventh Circuit has held that a credit reporting agency as a matter of law meets the requirement of using reasonable procedures to assure maximum possible accuracy when it relies on a presumptively reliable source, such as a court docket, *Henson*, F.3d at 285, or when it relies on the reports from the thousands of financial institutions who constantly send information to Experian, a credit reporting agency, *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 972–73 (7th Cir. 2004).

The Defendant relies on the holding in *Henson* to argue that it used reasonable procedures to assure the accuracy of its report when it relied on the PACER docket. The court in *Henson* ruled: "We . . . hold that, as a matter of law, a credit reporting agency is not liable under the FCRA for reporting inaccurate information obtained from a court's Judgment Docket, *absent prior notice from the consumer that the information may be inaccurate*." *Henson*, 29 F.3d at 285 (emphasis added). The emphasized phrase is the chink in the Defendant's armor here.

It is true that, if the Defendant had no notice from the Plaintiff, it would be in the clear via *Henson's* holding. The PACER docket used in federal courts, like a state court "Judgment Docket, [is] a presumptively reliable source." *Id.* So the dispositive issue here becomes whether the Defendant received notice that information regarding a criminal conviction is not accurate.

12

Notice would create a duty on the part of the Defendant to examine its information and its sources more closely. *See Crabill*, 259 F.3d at 664 (potentially misleading information "may have triggered the statutory duty to reconsider an individual's credit report if alerted to a potential error"). "A credit reporting agency that has been notified of potentially inaccurate information in a consumer's credit report is in a very different position than one who has no such notice." *Henson*, 29 F.3d at 286. Exclusive reliance on public court documents "may not be justified once the credit reporting agency receives notice that the consumer disputes information contained in his credit report. When a credit reporting agency receives notice, it can target its resources in a more efficient manner and conduct a more thorough investigation." *Id.* at 286–87.

In *Henson*, the Seventh Circuit during its § 1681e(b) analysis mentioned two types of notice that affect a credit reporting agency's liability: first, a consumer's notice to the credit reporting agency, before the agency reports anything, that the information the agency has received is not reliable, or "*prior* notice from the consumer that the information may be inaccurate," *Henson*, 29 F.3d at 285 (emphasis added); and, second, notice from the consumer after the credit reporting agency reports erroneous information. "Once the information is erroneously reported on the consumer's credit report, the consumer will be alerted to the error and can then seek correction of the error by notifying the credit reporting agency or the court itself." *Id.* at 286.

The *Henson* court also discussed notice when it addressed the plaintiff's claim under 15 U.S.C. § 1681i, which involves a credit reporting agency's obligation to reinvestigate a report when a consumer disputes it. That discussion of notice is useful for analysis of notice under a § 1681e(b) claim. "[A] credit reporting agency may be required , in certain circumstances, to

13

verify the accuracy of its initial source of information." *Id.* at 287.

> Whether the credit reporting agency has a duty to go beyond the original source will depend, in part, on *whether the consumer has alerted the reporting agency to the possibility that the source may be unreliable* or *the reporting agency itself knows or should know that the source is unreliable*.

*Id.* (emphases added). The first portion of emphasized text does not state when the consumer's notice has to be made. It simply states that notice comes when a consumer, before or after a report, informs or alerts a reporting agency that a source might be unreliable. The second portion of emphasized text, after the "or," indicates yet another type of notice, that is, notice arising from what a credit reporting agency can simply "know[]" or "should know" regarding a reliability problem with a source.

Based on all the discussion in *Henson*, notice can arise from: (1) a consumer's notice to a credit reporting agency, before any report is issued, that a *source* of information is not reliable; (2) a consumer's notice to a credit reporting agency, before any report is issued, that a *particular piece* of information is inaccurate; (3) a consumer's notice to a credit reporting agency, after an erroneous report is issued, that a source of information is not reliable; (4) consumer's notice to a credit reporting agency, after an erroneous report is issued, that a particular piece of information is not accurate; and, (5) something else, unspecified by the court in *Henson*, that causes the credit reporting agency to "know[] or should know that the source is unreliable." *Id.* Accordingly, notice can pertain to a source of information or a piece of reported information, and can come either before or after a report is issued.

The Defendant, in its summary judgment filings, denies it had notice of the inaccuracy of the Texas docket. Yet the documents in the record indicate otherwise. Before the Defendant performed the criminal background search, it received the Plaintiff's job application and his FBI

record. (Plaintiff's Resp. to Mot. for Summ. J., Ex. D, Poquette letter at 1; DE 64-5 at 1.) The job

application stated the Plaintiff did not have a criminal record, and the FBI record was ambiguous

as to the status of a criminal background. On the Plaintiff's job application to Delta, he checked

the "NO" box for the question "HAVE YOU EVER BEEN CONVICTED OF OR ARE

CHARGES CURRENTLY PENDING FOR VIOLATION OF ANY LAW OTHER THAN

MINOR TRAFFIC VIOLATIONS?" (Pl. Resp. in Opp. to Summ. J., Ex. A, Job Application at

1; DE 64-2 at 5). The Plaintiff's FBI record indicates that "CHARGES" were dismissed against

the Plaintiff, and that his sentence of a year of probation was imposed "WITHOUT ENTERING

A JUDGMENT OF CONVICTION." (Def. Discl., Doc. 4, 3, FBI Record at 1; DE 35-4 at 5.)

The FBI record also lists the federal statute that authorized such a sentence, 18 U.S.C. § 3607,

the Federal First Offender Act (FFOA). This statute provides that a court, under certain

conditions and for certain violations, can with the consent of the defendant

> place him on probation for a term of not more than one year without entering a judgment
> of conviction. At any time before the expiration of the term of probation, if the person
> has not violated a condition of his probation, the court may, without entering a judgment
> of conviction, dismiss the proceedings against the person and discharge him from
> probation. At the expiration of the term of probation, if the person has not violated a
> condition of his probation, the court shall, without entering a judgment of conviction,
> dismiss the proceedings against the person and discharge him from probation.

18 U.S.C. § 3607(a). The statute also provides that a "disposition under subsection (a) . . . shall

not be considered a conviction for the purpose of a disqualification or a disability imposed by

law upon conviction of a crime, or for any other purpose." 18 U.S.C. § 3607(b). *See also Gill v.

Ashcroft*, 335 F.3d 574, 578 (7th Cir. 2003) ("[E]ven if a disposition under § 3607 counts as a

conviction in immigration law, it would not be a conviction for other purposes, such as firearms

disabilities.").

15

The Defendant argues that the Plaintiff's "employment application did not provide notice that the information *on the Texas Court's docket* was inaccurate." (Def. Reply in Supp. of Mot. for Summ. J. at 10; DE 67 at 10) (emphasis added). That, as some FCRA decisions say, is "'technically accurate' but misleading." *E.g., Henson*, 29 F.3d at 285 n.4. It is true that the employment application did not say the information on the PACER docket was inaccurate. If that were the standard, however, consumers would have to somehow divine the identity of documents containing inaccurate information before the consumers ever saw the documents or the credit report based on the erroneous documents. Instead, the second type of notice identified in *Henson* allows consumers to tell credit reporting agencies ahead of time that a particular piece of alleged information about them (for example, that they have a criminal conviction or have filed for bankruptcy) is inaccurate. *See* 29 F.3d at 295 ("prior notice from the consumer that the *information* may be inaccurate") (emphasis added). That is just what the Plaintiff did in his employment application. The Plaintiff was not required to state that there was a docket located in Texas containing inaccurate information about criminal charges and their disposition; it was enough to say he did not have a conviction. That provided notice.

The FBI record that the Defendant received from Delta also gave notice. The Defendant admits receiving this record and using it as the starting point to find details about the Plaintiff's case in Texas. (Pl. Resp. to Mot. for Summ. J., Ex. D, Poquette letter, at 1; DE 64-5 at 2.) The phrase "without entering a judgment of conviction" and the entirety of its meaning may not be immediately clear to the Defendant's employees who read it, but as noted above, the phrase indicates the judgment was something other than a criminal conviction. This falls into the fifth type of notice identified in *Henson*. This notice did not come from the consumer but from his

employer, and receiving it means the Defendant "should know that the source is unreliable," 29

F.3d at 287, or at least that the PACER document's reliability is called into question.

Having both types of notice that the Defendant did not have a criminal conviction, the

Defendant had a duty to investigate the matter more closely when it obtained information

indicating the Plaintiff did have a criminal conviction. *Henson*, 29 F.3d at 286–87; *Crabill*, 259

F.3d at 664. The Seventh Circuit has not discussed extensively the exact contours of what a

credit reporting agency's duty entails once it receives notice of inaccuracy or unreliability, but

the case *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662 (7th Cir. 2001), sheds some light on that

duty. In that case, the plaintiff, Jerry Crabill, had a brother named John whose social security

number differed by only the last digit. *Id.* at 663. Requests for Jerry's credit report sometimes led

to John's report being issued instead, or sometimes led to their reports being combined.

> The ensemble was potentially misleading, however, and may have triggered the statutory
> duty to reconsider an individual's credit report if alerted to a potential error. . . . [O]nce it
> learned from Jerry that the two files indeed referred to different people[,] the statutory
> duty just mentioned clocked in and at that point the continued sending of both files to
> creditors might be viewed as a failure to maintain reasonable procedures for assuring
> accuracy.

*Id.* at 664 (citations omitted). As a result, the court ruled that the reasonableness of the credit

agency's procedures could not be resolved on summary judgment.[2] *Id.*

Likewise, in this case the two types of prior notice the Defendant possessed cast doubt on

the information it received from Texas indicating there was a criminal conviction. In light of this

inconsistency, the Defendant had a duty to investigate the matter and to question the reliability of

its source(s) and the accuracy of the information it received. Its failure to do so raises a genuine

---

[2] The defendant in that case did prevail on summary judgment on other grounds, causation and damages.

issue of material fact about whether it followed "reasonable procedures to assure maximum possible accuracy," 15 U.S.C. § 1681e(b), thus precluding summary judgment. A jury could infer the Defendant did not use reasonable procedures, or it could, after hearing all the testimony and reviewing all the evidence, determine the Defendant did follow reasonable procedures. But the Court cannot say so either way as a matter of law.

That ruling finds support in cases outside the Seventh Circuit where a credit reporting agency had notice of inaccuracy or unreliability of a source or information. If a credit reporting agency possesses or uses inconsistent or contradictory information about a consumer, particularly relating to a person's criminal record, then the agency can be considered to have notice of the inaccuracy and is not entitled to summary judgment on the reasonableness of its procedures.[3] In *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409 (4th Cir. 2001), a credit reporting agency relied on a subvendor whose employee failed to verify the oral comment of a court clerk that the plaintiff's conviction was a felony (when it was really a misdemeanor). *Id.* at 417. The Fourth Circuit held that it was for a jury to decide if the subvendor used reasonable procedures in verifying and reporting the conviction, and if the credit reporting agency used reasonable procedures for instructing its subvendors "on the appropriate sources for reliable

_____

[3] *See Obabueki v. Int'l Bus. Machs. Corp.*, 145 F. Supp. 2d 371, 399 (S.D.N.Y. 2001) (denying credit reporting agency's summary judgment motion because it reported the plaintiff's conviction but nothing about the subsequent dismissal under a state law that vacated the conviction); *Smith v. Auto Mashers, Inc.*, 85 F. Supp. 2d 638, 641 (W.D.Va. 2000) (credit reporting agency entitled to summary judgment because the plaintiff failed to present evidence that the defendant used "internally inconsistent" information); *Wiggins v. Equifax Services, Inc.*, 848 F. Supp. 213 (D.D.C. 1993) (denying defendant's summary judgement motion and ruling a jury should weigh the reasonableness of the accuracy procedures after the credit reporting agency wrongly attributed a drug conviction to the plaintiff because he had a similar name as the real convict and then reported that information to the employer even after learning the two men had different middle names and dates of birth); *Morris v. Credit Bureau of Cincinnati, Inc.*, 563 F. Supp. 962, 968 (S.D. Ohio 1983) (finding that "a reasonably prudent credit reporting agency would have procedures to detect the similarities in the two files that would have prevented further reporting of inaccurate information about" the plaintiff); *Bryant v. TRW, Inc.*, 487 F. Supp. 1234, 1242 (E.D. Mich. 1980) (rejecting the defendant credit reporting agency's view that it had no obligation to compare information when two reports on the same person "on their face . . . appeared inconsistent"), *aff'd*, 689 F.2d 72 (6th Cir. 1982).

information about a person's criminal record." *Id.*

In *Philbin v. Trans Union Corp.*, 101 F.3d 957 (3d Cir. 1996), two credit reporting agencies listed information about bankruptcy proceedings involving the plaintiff's father as well as erroneous tax lien information on the plaintiff's reports. The Third Circuit reversed the district court's summary judgment ruling that had been in favor of the credit reporting agencies. A credit reporting agency "issued two reports that were inconsistent with each other. Unquestionably, one was inaccurate. The inconsistencies related to the inaccurate information. . . . [T]hese facts alone are sufficient to allow a jury to infer that TRW did not follow reasonable procedures." *Id.* at 966 (footnote omitted).

In *Stewart v. Credit Bureau, Inc.*, 734 F.2d 47 (D.C. Cir. 1984), a credit reporting agency issued inaccurate reports about the plaintiff relating to bankruptcy and tax liens. "Certainly, inconsistencies within a single file or report involving an inaccuracy as fundamental as a falsely reported wage earner plan, as well as inconsistencies between two files or reports involving less fundamental inaccuracies, can provide sufficient grounds for inferring that an agency acted negligently in failing to verify information." *Id.* at 52. As a result, the D.C. Circuit ruled that "summary judgement on the issue of the reasonableness of [the defendant's] procedures is inappropriate at this time." *Id.* at 53.

In *McKeown v. Sears Roebuck & Co.*, 335 F. Supp. 2d 917 (W.D. Wis. 2004), defendant Sears reported to a credit reporting agency that the plaintiff was deceased, but in the following eleven months leading up to a report on the plaintiff, other credit activity was reported and no other creditor reported the plaintiff was deceased. *Id.* at 930. Relying on *Henson*, the court ruled that Sears was a presumptively reliable source of information and reporting its information was

19

reasonable. *McKeown*, 335 F. Supp. 2d at 929. But because of the discrepancies in the file on the plaintiff, the credit reporting agencies' procedures to assure the accuracy of the reports was called into question. *Id.* at 930–31. "This is not one of those cases in which summary judgment is appropriate on the ground that the reasonableness of defendants' reporting practices is beyond dispute." *Id.* at 931.

The Seventh Circuit has also instructed that courts, when examining a credit reporting agency's post-notice duty, should consider "the cost of verifying the accuracy of the source versus the possible harm inaccurately reported information may cause the consumer." *Henson*, 29 F.3d at 287. For example, the Seventh Circuit in *Sarver v. Experian*, 390 F.3d 969 (7th Cir. 2004), ruled that Experian's procedures for processing more than 50 million updates each day and receiving information from about 40,000 sources were reasonable as a matter of law. *Id.* at 972–73. There was no notice of inaccuracy or unreliability at issue, so Experian employees would have had to examine "each computer-generated report . . . for anomalous information," *id.* at 972, and then investigate it if they found any. "We cannot find that such a requirement to investigate would be reasonable given the enormous volume of information Experian processes daily. . . . The increased cost to Experian to examine each of these entries individually would be enormous." *Id.*

In this case, any additional cost in investigating the inconsistent information about the Plaintiff would have been minor. Unlike the automated reports generated in *Sarver*, this case involved one or more employees of the Defendant conducting an extensive, individualized criminal background check of the Plaintiff. The Defendant used computers and possibly manual, on-site record searching at court houses to look for and examine records of the Plaintiff. The

20

Defendant also took the time and effort to contact the U.S. Attorney's office in Texas about what it found on PACER. The cost in time, money, and manpower was already greater than a search involving automated reports or a simple financial background check.

Investigating the matter further to clarify the inconsistent information about the Plaintiff could have included: obtaining the actual judgment in the case; asking the clerk's office about the meaning of "without entering a judgment of conviction" or of 18 U.S.C. § 3607; otherwise seeking to understand the meaning of those phrases from the U.S. Attorney's office or elsewhere; or, even asking the Plaintiff to explain the discrepancy. None of these tasks would have entailed significant additional cost or time. In fact, when the Defendant did reinvestigate the criminal charges, it was able to learn the truth by making a few phone calls within one day and it sent the amended report the next day.

The possible harm of inaccurate information for the consumer in this case is great, and not just in hindsight. It would not be difficult to foresee how wrongly reporting that a person, particularly a pilot, has a criminal conviction would be harmful to that person and his employment prospects. This is much more harmful than a reporting reflecting, for example, overdue credit card payments, which could result in a denial of credit.

In sum, the Court cannot say as a matter of law that the Defendant used reasonable procedures to assure the maximum possible accuracy of its report about the Plaintiff. The Defendant had notice that the Plaintiff did not have a criminal conviction, so it had a duty to examine the reliability of its sources and the accuracy of its information when it found information indicating the Plaintiff had a criminal conviction. That extra investigative effort would not have been particularly costly or necessarily time-consuming, especially when weighed

21

against the obviously significant harm that can result from inaccurately reporting that a person has a criminal record. It is for a jury to sort this out.

The questions of fact remaining include but are not limited to: the Defendant's procedures to conduct criminal background checks, including when, if at all, court documents and not just dockets are examined; confirmation and verification policies and procedures, including what kind of confirmation took place with the clerk's office and U.S. Attorney's Office; and, procedures governing a review of information about background check subjects for inconsistent information, what is to be done if inconsistent information is found, and how it is to be reported, if at all, to the user.

*c) Causation and Damages*

To state a claim under 15 U.S.C. § 1681e(b), a plaintiff must also show causation and damages. "Without a causal relation between the violation of the statute and the loss of credit, or some other harm, a plaintiff cannot obtain an award of 'actual damages.'" *Crabill v. Trans Union, L.L.C.*, 259 F.3d 662, 664 (7th Cir. 2001) (citing *Philbin v. Trans Union Corp.*, 101 F.3d 957, 963 (3d Cir. 1996)). *See also Ruffin-Thompkins v. Experian Info. Solutions, Inc.*, 422 F.3d 603, 608 (7th Cir. 2005); *Sarver v. Experian Info. Solutions*, 390 F.3d 969, 971 (7th Cir. 2004).

In this case, the Plaintiff alleges that the Defendant's inaccurate report sent to Defendant Delta resulted in the revocation of his flight status and security clearance and his eventual termination. (P. Am. Compl. ¶¶9, 11–13; DE 37 at 2–3.) This, in turn, the Plaintiff alleges, damaged his reputation, his contractual relationship with his employer, and, his professional prospects in the form of "loss of flight time, loss of flight pay, [and,] loss of flight experience."

22

(*Id.* ¶13; DE 37 at 3.)

The Defendant admits the Plaintiff's security clearance was suspended, (Def. Am. Answer ¶9; DE 28 at 4), but otherwise does not address the issues of causation and damages in its summary judgment filings. The Defendant presented no facts or evidence to controvert the Plaintiff's allegations of causation and damages.

As a result, this Court construes the facts of the Plaintiff's termination and flight status/security clearance revocation "in the light most favorable to the non-moving party," *Bellaver v.Quanex Corp.*, 200 F.3d 485, 491–92 (7th Cir. 2000), and "draw[s] all reasonable and justifiable inferences in favor" of the Plaintiff. *Id.* at 492. It is a reasonable to infer that Defendant Verification's reporting that the Plaintiff had a criminal conviction resulted in his termination and the revocation of his flight status and security clearance.

In conclusion, the Plaintiff's claim under § 1681e(b) of the FCRA cannot be resolved as a matter of law and instead must be heard by a trier of fact.

**2.      *§ 1681k: Strict Procedures To Insure Public Record Information is Complete and Up To Date***

The FCRA imposes requirements for when a credit reporting agency "furnishes a consumer report for employment purposes and which for that purpose compiles and reports items of information on consumers which are matters of public record and are likely to have an adverse effect upon a consumer's ability to obtain employment." 15 U.S.C. § 1681k(a). The credit reporting agency has a choice between two requirements. When it reports the public record information to the user or requester, it can "notify the consumer of the fact that public record

23

information is being reported by the consumer reporting agency, together with the name and address of the person to whom such information is being reported." *Id.* § 1681k(a)(1). Or, it can "maintain *strict procedures* designed to insure that whenever public record information which is likely to have an adverse effect on a consumer's ability to obtain employment is reported it is complete and up to date." *Id.* § 1681k(a)(2) (emphasis added). The subsection lists "arrests, indictments, [and] convictions" as examples of "items of public record." *Id.* The Plaintiff's complaint in paragraph 10 states a claim under this section. The Defendant did not address a claim under § 1681k in its motion for summary judgment.

The Seventh Circuit has not considered FCRA claims under 1681k. But the Fourth Circuit did in a case factally similar to this one. *Dalton v. Capital Associated Indus., Inc.*, 257 F.3d 409 (4th Cir. 2001). In that case, the credit reporting agency inaccurately reported that the plaintiff had pleaded guilty to a felony when it was "undisputed that [the plaintiff] pled guilty to a misdemeanor." *Id.* at 416. The credit reporting agency (appropriately) conceded its report of criminal history fell within this section and that it did not notify the plaintiff when it sent its report to his prospective employer as required by § 1681k(a)(1). That left the issue of "whether [the credit reporting agency] maintained 'strict procedures' to ensure that [the plaintiff's] criminal record was complete and up to date." *Id.* at 417. Because the court had already determined the defendant's summary judgment motion should be denied for the plaintiff's § 1681e(b) claim, "we necessarily hold that there is a factual dispute over whether it followed strict procedures." *Id.* The court did not find it necessary to delineate the difference between "reasonable procedures" and "strict procedures," other than the so-obvious-as-to-be-unstated difference that "reasonable" is a less-demanding standard than "strict."

24

The case *Obabueki v. Int'l Bus. Machs. Corp.*, 145 F. Supp. 2d 371 (S.D.N.Y. 2001), also is factually similar. A credit reporting agency reported to the plaintiff's prospective employer that he had a welfare fraud conviction but did not mention that it had been dismissed upon his completion of probation pursuant to a state law, or that the judgment order in the case set aside the plea, verdict, and finding of guilt. *Id.* at 374–75. As a result, the court found the report to be "neither complete nor up to date." *Id.* at 396. "The information provided to IBM was clearly deficient because the dismissal was not mentioned," *id.* at 397, "and it was not up to date because it did not provide the most current information with regard to that entry, . . . [the] dismissal." *Id.* The court[4] declined to grant summary judgment for either party because "there are issues of fact related to Choicepoint's investigatory procedures which would affect the determination of whether Choicepoint violated Section 1681k in the conduct of their investigations." *Id.*

In this case, the Defendant's report to Delta was furnished for employment purposes. The Defendant compiled and reported items from the public record: information on the PACER system relating to the Plaintiff's criminal case in Texas. The Defendant could not have had any doubt that the matter it reported was likely to have an adverse effect on the plaintiff's ability to obtain or maintain his employment. The Defendant nowhere in its summary judgment filings or in the record indicates that it notified the Plaintiff it was reporting public record information about him. Like *Dalton*, that leaves the issue of whether the Defendant used strict procedures to

---

[4] The *Obabueki* case proceeded to trial where the jury ruled that the credit reporting agency violated 15 U.S.C. §§ 1681e(b) and 1681k "by negligently failing to maintain required procedures designed to ensure the completeness and accuracy of its reports." *Obabueki v. Choicepoint, Inc.*, 236 F. Supp. 2d 278, 280 (S.D.N.Y. 2002). After that, the court granted the defendant's motion for judgment as a matter of law under Fed. R. Civ. P. 50(b) on other grounds, namely the failure to show that the defendant's negligence caused the plaintiff's damages. *Obabueki*, 236 F. Supp. 2d at 285.

make sure the information was complete and up to date.

As in *Dalton*, 257 F.3d at 417, because the Court here has already found that it cannot say as a matter of law that the Defendant used *reasonable* procedures to ensure an accurate report, the Court must also decline to find that the Defendant, as a matter of law, used *strict* procedures to make sure the information was complete and up to date, namely, reflecting the fact that one charge was dismissed and the other had a sentence imposed without entering a judgment of conviction (instead of reflecting a guilty plea). Because the Defendant's report omitted the "without entering a judgment of conviction" information, it was not complete or up to date. *See Obabueki*, 145 F. Supp. 2d at 396–97.

A claim under § 1681k, like under § 1681e(b), requires causation and damages. For the reasons explained above for the § 1681e(b) claim, and because no legal argument addressed the § 1681k claim, the allegations regarding causation and damages apply to this §1681k claim and are sufficient to survive the summary judgment motion.

**3.      *Other Alleged Claims***

The Plaintiff in his response to the summary judgment motion makes a number of other statements that can be construed as legal claims against the Defendant. One claim appears to be that the Defendant was not authorized to possess the Plaintiff's FBI record, and that possessing the record may be a violation of the Privacy Act. (Pl. Resp. Memo at 6–9; DE 65.) Another is that the Defendant took "adverse action" against the Plaintiff when it made its report to Defendant Delta. (*Id.* at 11). These claims were not included in the amended complaint. "A plaintiff may not amend his complaint through arguments in his brief in opposition to a motion

for summary judgment." *Shanahan v. City of Chicago*, 82 F.3d 776, 781 (7th Cir. 1996).

Accordingly, these claims are not considered.


### 4.        *State Law Claims*

The Plaintiff's complaint includes state law claims of defamation, invasion of privacy,

negligence and/or recklessness, and interference with employment/contractual relations.

The Defendant correctly points out that the FCRA preempts such state law claims when

only negligence, as opposed to malice or willful intent, is at issue.

> Except as provided in sections 1681n and 1681o of this title, no consumer may
> bring any action or proceeding in the nature of defamation, invasion of privacy, or
> negligence with respect to the reporting of information against any consumer reporting
> agency . . . based on information disclosed pursuant to section 1681g, 1681h, or 1681m
> of this title, or based on information disclosed by a user of a consumer report to or for a
> consumer against whom the user has taken adverse action, based in whole or in part on
> the report except as to false information furnished with malice or willful intent to injure
> such consumer.

15 U.S.C. § 1681h(e). *See also Young v. Equifax Credit Info. Servs., Inc.*, 294 F.3d 631, 638 (5th

Cir. 2002); *King v. Retailers Nat. Bank*, 388 F. Supp. 2d 913, 916 (N.D. Ill. 2005) ("Section

1681h(e) allows for state law claims by creating an exception for common law negligence,

defamation, and invasion of privacy claims *where malice or willful intent to injury the consumer*

*is involved*.") (emphasis added); *Anderson v. Trans Union, LLC*, 345 F. Supp. 2d 963, 973–74

(W.D. Wis. 2004).

The Plaintiff argues that he "need not show malice or evil motive." (Pl. Resp. Memo. in

Resp. to Def. Mot for Summ. J. at 5; DE 65 at 5.) But his case citations[5] in support are

---

[5] *Phillips v. Grendahl*, 312 F.3d 357, 370 (8th Cir. 2002); *Bruce v. First U.S.A. bank, Nat'l Ass'n*, 103 F. Supp. 2d 1135, 1144 (E.D. Mo. 2000).

discussions of FCRA claims under § 1681n for "willful noncompliance," not the standard of "willful intent to injury such consumer" in § 1681h(e), which would allow related state law claims.

There is a difference in the standards. Section 1681n speaks of liability for "[a]ny person who willfully fails to comply with any requirement imposed under this subchapter with respect to any consumer." 15 U.S.C. § 1681n(a). When that occurs, punitive damages and legal costs are allowed. But § 1681h(e) addresses a different and more nefarious situation, when "false information [is] furnished with malice or willful intent *to injure such consumer*." 15 U.S.C. § 1681h(e) (emphasis added). In this situation, a plaintiff may make additional charges, related state law claims, against the defendant. The willfulness in § 1681n refers to not complying with the law, while willful intent in § 1681h(e) refers to purposefully injuring a consumer with false information.

While the Seventh Circuit has not addressed this difference, other circuit courts have with a fair amount of uniformity. "To show willful noncompliance with the FCRA, [the plaintiff] must show that [the defendant] knowingly and intentionally committed an act in conscious disregard for the rights of others, but need not show malice or evil motive. . . . Willful noncompliance under section § 1681n requires knowing and intentional commission of an act the defendant knows to violate the law." *Phillips v. Grendahl*, 312 F.3d 357, 368, 370 (8th Cir. 2002) (internal quotations omitted) (alterations in original) (citing cases with the same approach from the Second, Third, Fifth, Fourth, Sixth, and Tenth Circuits).

This view makes sense in light of the escalating consequences for a violator of the FCRA, as laid out in the structure of the statute. Section 1681o provides for some consequences

28

for negligent noncompliance, § 1681n provides greater consequences for willful noncompliance, and § 1681h(e) provides even more consequences – additional state law claims– for willful intent to injure a consumer.

The Plaintiff has not alleged any facts tending to show the Defendant meant to injure the consumer. The Defendant created the report because it was hired to do so by Delta, not because it had a grudge toward the Plaintiff. The Defendant's prompt action in response to the Plaintiff's challenge of the report belies any accusation of intent to injure. The Defendant within one day corrected the report and on the next day it sent a corrected report to Delta and the Plaintiff instead of justifying or making an explanation for its original report. Those are not the actions of an entity meaning to injure a person.

Malice on the part of the Defendant would also allow the state law claims to survive, but the Plaintiff also has not alleged any facts tending to show malice on the part of the Defendant.

> Unfortunately the word "malice" does not have a settled meaning in law. Sometimes it means ill will, hatred, "evil design," or, in short, "malice" in its everyday sense. But sometimes, as in defamation law (also in criminal law), it means simply knowledge of the harmful consequences of an act or-what is just a very high degree of negligence-recklessness (the publisher thought it highly likely, without knowing for certain, that the defamatory piece he was publishing was false, and he did nothing to determine whether it was in fact false).

*Matheny v. United States*, 469 F.3d 1093, 1097 (7th Cir. 2006) (citations omitted).

The FCRA couples "malice" with "willful intent to injure" in § 1681h(e), so their meaning under the statute must be similar or identical. For the same reasons that there is no evidence of willful intent to injure, there is no evidence of malice in the first meaning of the word discussed in *Matheny*. Also, there are no facts to suggest that the Defendant showed malice in the second meaning of the word discussed in *Matheny*, that is, recklessness. Nothing tends to

show that the Defendant thought the criminal conviction was inaccurate but did nothing to do determine if it was false. The Defendant did take steps to determine its accuracy. These steps turned out in hindsight to be insufficient, but that does not indicate recklessness. As discussed earlier in this opinion, it is more indicative of negligence, and a jury will have to decide the matter.

## CONCLUSION

For the reasons stated above, the Defendant's Motion for Summary Judgment [58] is GRANTED in PART and DENIED in PART. The Plaintiff's two FCRA claims under 1681e(b) and 1681k are to be heard by a trier of fact.

SO ORDERED on February 4, 2008.

   s/ Theresa L. Springmann       
THERESA L. SPRINGMANN
UNITED STATES DISTRICT COURT